## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AMBROSE EKUNDAYO,<br><br>                    Plaintiff,<br><br>          v.<br><br>EXPERIAN INFORMATION SOLUTIONS INC.,<br>TRANS UNION LLC, EQUIFAX INFORMATION<br>SERVICES LLC and CENLAR FSB d/b/a<br>CENTRAL LOAN ADMINISTRATION &<br>REPORTING,<br><br>                    Defendants. | **Case No.:**<br><br><br>**COMPLAINT AND DEMAND FOR<br>JURY TRIAL**<br><br>   1.  FCRA, 15 U.S.C. §§ 1681 *et seq.* |

Plaintiff Ambrose Ekundayo ("Plaintiff"), by and through his undersigned attorneys, alleges the following against EXPERIAN INFORMATION SOLUTIONS INC. ("Experian"); TRANS UNION LLC ("Trans Union"), EQUIFAX INFORMATION SERVICES LLC ("Equifax") and CENLAR FSB d/b/a CENTRAL LOAN ADMINISTRATION & REPORTING ("Cenlar") (collectively "Defendants"):

### PRELIMINARY STATEMENT

1.  This is an action for actual, statutory and punitive damages, costs and attorneys' fees brought pursuant to the Federal Fair Credit Reporting Act (FCRA) 15 U.S.C. §§ 1681a–x and for the common-law tort of defamation.

2.  The FCRA exists to protect consumers' privacy and to impose upon those who trade in consumers' private information strict requirements to ensure that the information they report is as accurate as possible.

3.  The Act likewise demands that consumers' disputes of inaccurate information be taken seriously by industry players, requiring that they do much more than simply pass information between themselves electronically without actually investigating the substance of a consumer's dispute and consider all information available in conducting such investigations.

4.  The FCRA demands of reporting agencies like Experian, Equifax and Trans Union that they utilize reasonable procedures to assure the maximum possible accuracy of the information they report. 15 U.S.C. § 1681e(b). When a consumer disputes an item of information, the agency must investigate the dispute and, if the information cannot be verified, delete it. 15 U.S.C. § 1681i.

5.  Also, when a consumer disputes the accuracy of information with the agencies, they must transmit that dispute to the entity who furnished the information. The furnisher must then conduct its own, independent investigation of the dispute. Id. § 1681s-2(b).

6.  Plaintiff brings claims under Section 1681e(b) against Experian, Equifax and Trans Union because they reported about Plaintiff inaccurate information regarding a mortgage account. When Plaintiff disputed the inaccuracies, the agencies did not reasonably investigate, also violating Section 1681i.

7.  The Consumer Financial Protection Bureau has noted, "experience indicates that [CRAs] lack incentives and under-invest in accuracy" Consumer Fin. Prot. Bureau, Supervisory Highlights Consumer Reporting Special Edition 21 (Issue 14, March 2, 2017). This is particularly true as to how the CRA Defendants have complied with their now 50-year-old obligation to conduct a meaningful accuracy investigation. The CRA Defendants have been repeatedly sued by consumers, sanctions by regulators and

reprimanded by both District and Appellate courts to do more than an automated parroting of what their customer-creditors instruct. Had they followed that advice and heeded those warnings, the Plaintiff would not have been harmed.

## JURISDICTION

8. The jurisdiction of this Court is conferred by 15 U.S.C. § 1681(p) and 28 U.S.C. § 1367.

9. The Plaintiff is a natural person and resident of the State of New York.  He is a "consumer" as defined by 15 U.S.C. § 1681 a(c).

10. Venue is proper in this District per 28 U.S.C. § 1391, as the acts, omissions and transactions that give rise to this action occurred, in substantial part, in this District.

11. Venue is also proper in this district because Plaintiff lives in this District, Defendants conduct business in this District, and the injury occurred in this District.

## PARTIES

12. Plaintiff, Ambrose Ekundayo, is a natural person residing in Bronx County, New York.

13. Plaintiff is a "consumer" as defined by the FCRA, 15 U.S.C. §1681a(c).

14. Defendant Experian Information Solutions Inc. is headquartered in California and does business in the State of New York through it registered agent located in New York, New York.

15. Experian is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f), and it disburses consumer reports to third parties for monetary compensation.

16. Defendant Trans Union LLC is headquartered in Illinois and does business in the State of New York through its registered agent located in Albany, New York.

17. Trans Union is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f), and it disburses consumer reports to third parties for monetary compensation.

18. Defendant Equifax Information Services LLC is headquartered in Georgia and does business in the State of New York through its registered agent located in Albany, New York.

19. Equifax is a "credit reporting agency," as defined in 15 U.S.C. § 1681a(f) and it disburses consumer reports to third parties for monetary compensation.

20. Defendant Cenlar FSB is a "person," as defined under 15 U.S.C. § 1681a(b), headquartered in Ewing, New Jersey and does business in the State of New York. Cenlar is also a "furnisher" as defined by the FCRA and caselaw interpreting the statute.

21. Defendants acted through their agents, employees, officers, members, directors, heirs, predecessors, successors, assigns, principals, trustees, sureties, subrogees, representatives, and insurers.

## GENERAL FACTUAL ALLEGATIONS

*Sections 1681e(b) and 1681i(a) of The Fair Credit Reporting Act Require Substantive Investigations and Prohibit Mere "Parroting" of the CRA Defendants' Creditor-Customers*

22. "Congress enacted FCRA in 1970 out of concerns about abuses in the consumer reporting industry. *See* S. Rep. No. 91–517, at 3 (1969); 116 Cong. Rec. 35941 (1970) (statement of Sen. Proxmire); id. at 36570 (statement of Rep. Sullivan); . . . . In enacting FCRA Congress adopted a variety of measures designed to insure that agencies report accurate information." Dalton v. Capital Associated Indus., Inc., 257 F.3d 409, 414–15 (4th Cir. 2001)."In recognition of the critical role that CRAs play in the credit markets and the serious consequences borne by consumers because of inaccurate information disseminated in consumer credit reports prepared by CRAs, Congress placed on a CRA

what can only be described as very high legal duties of care, set forth . . . in 15 U.S.C. §§ 1681e(b), 1681i(a)(1)(A), and 1681i(a)(3)(A)." Burke v. Experian Info. Sols., Inc., No. 1:10-cv-1064 AJT/TRJ, 2011 WL 1085874, at *4 (E.D. Va. Mar. 18, 2011).

23. "Section 1681e(b) sets forth the CRAs' overall du[t]y:

(b) Accuracy of report. Whenever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."

*Burke v. Experian Info. Sols., Inc.*, No. 1:10-cv-1064 AJT/TRJ, 2011 WL 1085874, at *4 (E.D. Va. Mar. 18, 2011).

24. Section 1681i(a), on the other, hand requires much more from a CRA after a consumer has placed it on notice of an inaccuracy through her dispute:

[I]f the completeness or accuracy of any item of information contained in a consumer's file at a consumer reporting agency is disputed by the consumer and the consumer notifies the agency directly . . . of such dispute, the agency shall, free of charge, conduct a reasonable reinvestigation to determine whether the disputed information is inaccurate and record the current status of the disputed information, or delete the item from the file . . . before the end of the 30-day period[.]

15 U.S.C. § 1681i(a)(1)(A).

25. Section § 1681i(a) imposes "a duty . . . to make reasonable efforts to investigate and correct inaccurate or incomplete information brought to its attention by the consumer." *Cahlin v. Gen. Motors Acceptance Corp.*, 936 F.2d 1151, 1160 (11th Cir. 1991). "[T]he term 'investigation' is defined as '[a] detailed inquiry or systematic examination' or 'a searching inquiry.'" *Hinkle v. Midland Credit Mgmt., Inc.*, 827 F.3d 1295, 1303 (11th Cir. 2016) (citations omitted).

26. It has long been the law that a CRA, such as Experian, Equifax, or Trans Union, does not fulfill its "grave responsibility" to conduct a reinvestigation of a consumer's dispute

by merely contacting the creditor who supplied the dispute item.  *See, e.g.*, *Pinner v. Schmidt,* 805 F.2d 1258, 1262 (5th Cir.1986) (concluding it was unreasonable for a credit reporting agency to contact only the creditor in its reinvestigation of a disputed debt); *Collins v. Experian Info. Sols., Inc.*, 775 F.3d 1330, 1333 (11th Cir.), *on reh'g sub nom. Collins v. Equable Ascent Fin., LLC*, 781 F.3d 1270 (11th Cir. 2015); *Carlisle v. Nat'l Commercial Servs., Inc.*, No. 1:14-cv-515-TWT-LTW, 2016 WL 4544368, at *9 (N.D. Ga. July 22, 2016), *report & recommendation adopted,* No. 1:14-cv-515-TWT, 2016 WL 4532219 (N.D. Ga. Aug. 29, 2016) ("[A] reasonable factfinder could find that merely contacting [the creditor] was not sufficient to determine whether the disputed information was inaccurate.").

27. That "grave responsibility" imposed by the FCRA reinvestigation requirement "must consist of something more than merely parroting information received from other sources." *Cushman v. Trans Union Corp.*, 115 F.3d 220, 225 (3d Cir.1997).

28. As the Fourth Circuit explained in *Johnson v. MBNA*:

> The key term at issue here, "investigation," is defined as "[a] detailed inquiry or systematic examination." Am. Heritage Dictionary 920 (4th ed.2000); see Webster's Third New Int'l Dictionary 1189 (1981) (defining "investigation" as "a searching inquiry").

357 3d 426, 430 (4th Cir. 2004).

29. Further, as the CRA Defendants are aware, this Court has held that even though the term "investigation" is not used in § 1681e(b), it is clear that Defendants have a duty to conduct a reasonable initial investigation pursuant to § 1681e(b) as well as § 1681i(a) and that this is "central" to the CRAs' duties of care under that portion of the Act:

This conclusion flows from the plain meaning of both [§1681e(b) and §1681i(a)]. For example, Section 1681e(b) requires (1) "reasonable procedures" that (2) "assure" (3) "maximum possible accuracy." To "assure" means "to make sure or certain: put beyond all doubt." *Webster's Third New International Dictionary* 133 (1993). "Maximum" means the "greatest in quantity or highest degree attainable" and "possible" means something "falling within the bounds of what may be done, occur or be conceived . . . ." *Id.* at 1396, 1771. It is difficult to imagine how "maximum possible accuracy" could be guaranteed without an adequate investigation. Likewise, Section 1681i(a)(1)(A) requires a "reinvestigation," necessarily implying that an "investigation" was required to have been performed in the first instance.

*Burke*, 2011 WL 1085874, at *4.

30. It has long been the law – since 1970 in fact – that:

[W]hen a CRA learns or should reasonably be aware of errors in its reports that may indicate systematic problems (by virtue of information from consumers, report users, from periodic review of its reporting system, or otherwise), it must review its procedures for assuring accuracy and take any necessary steps to avoid future problems. Similarly, it should establish procedures to avoid reporting information from its furnishers that appears implausible or inconsistent.

Fed. Tr. Comm'n, 40 YEARS OF EXPERIENCE WITH THE FAIR CREDIT REPORTING ACT (July 2011), at 67.[1]

31. Today, furnishers such as Cenlar and other of the CRA Defendants' furnishers have their own independent duties under the FCRA, principally those found at 15 U.S.C. § 1681s-2. But while the CRA Defendants' duties under § 1681e(b) were enacted in 1970 and have governed since, the duties on furnishers are much recent, enacted on in

---

[1] Available at https://www.ftc.gov/sites/default/files/documents/reports/40–years–experience–fair–credit–reporting–act–ftc–staff–report–summary–interpretations/110720fcrareport.pdf.

1996. THE CONSUMER CREDIT REPORTING REFORM ACT OF 1996, Pub. L. No. 104-208 (1996).

**Plaintiff Discovers The CRA Defendants Were Inaccurately Reporting the Account**

32. Sometime prior to the commencement of this action, Plaintiff received a letter from Citibank, his mortgage provider, informing him of Citibank's intention to transfer all mortgage accounts to Cenlar FSB beginning on or about April 1, 2019. Said letter was endorsed by Cenlar.

33. Plaintiff's mortgage loan with Citibank was amongst those transferred to Cenlar.

34. Within the letter, it was stated "if you currently make your loan payment via: EZ pay, Automatic deduction, Equity builder or Bi-weekly advantage, this service will continue automatically".

35. It didn't take long for Cenlar to retract its position regarding payments. When the loan payments resumed in April 2019, Cenlar took it upon itself to ignore all payments Plaintiff previously made on the loan and the automatic payment schedule he had set up.

36. Cenlar instead began to recalculate the Plaintiff's loan balance and treated the loan as if it was a new loan.

37. The first statement Plaintiff received from Cenlar was dated April 12, 2019 and had a payment due date of May 1, 2019. The total amount due to be paid was three hundred and twenty-five dollars and thirty-nine cents ($325.39).

38. Plaintiff sent to Cenlar a check dated April 24, 2019 for the total amount due. Cenlar presented the check for clearance on or about April 26, 2019. Consequently, the amount

on the payment was received and paid on April 26, 2019, well ahead of the payment due date.

39. Sometime thereafter, a representative from Cenlar (number 8209) contacted the Plaintiff and informed him that the amount paid on April 26, 2019 would not be credited to his account because Cenlar does not accept payments made by check.

40. The representative who now gave his name as "Tim", then requested that the Plaintiff make a payment immediately in order to prevent a default on his account. "Tim" demanded that the Plaintiff use either a bank debit or credit card to pay $353.28 to fulfill my obligation. After the transaction was completed, Plaintiff was given a confirmation number of JUA 4858052019.

41. On or about May 25, 2019, Plaintiff received a letter from Cenlar, confirming his credit card payment.

42. On or about June 17, 2019, Plaintiff then received a threatening letter from Cenlar which in part stated, "This is a legally required notice. We are sending this notice to you because you are behind on your mortgage payment...we have the right to invoke foreclosure based on the terms of your mortgage contract".

43. Despite Plaintiff making two separate payments for the same billing cycle, Cenlar then reported derogatory and inaccurate information to the Big Three credit reporting agencies, i.e. Experian, Equifax and Trans Union.

44. The most derogatory information Cenlar reported was that Plaintiff's mortgage account was transferred to its portfolio was "seriously delinquent" over 180 days and had to be "charged off".

45. The Plaintiff has never been late in paying his obligations to Cenlar. In fact, the Plaintiff has timely made his payments and has overpaid the account, a fact Cenlar has acknowledged with a refund to the Plaintiff.

46. Having learned that Cenlar was inaccurately reporting the account to the CRA Defendants, Plaintiff sent disputes to Experian, Equifax and Trans Union to attempt to have them remove the inaccuracies from his credit reports.

### *Plaintiff Disputes The Inaccuracies With The CRAs*

47. Having learned that Cenlar inaccurately reported the status of the account to the CRA Defendants, Plaintiff sent disputes to Experian, Trans Union, and Equifax to attempt to have them remove the inaccuracies from his credit reports.

48. On or around May 18, 2023 and September 15, 2023, Plaintiff sent correspondence to Experian, requesting that Experian verify and correct the inaccurate, erroneous and unverified representations made by Cenlar on his credit file.

49. Plaintiff received a dispute results report from Experian dated October 26, 2023.

50. Within the October 26, 2023 report, Experian continued its reporting of the inaccurate, erroneous and unverified representations made by Cenlar.

51. On or around May 18, 2023 and September 15, 2023, Plaintiff sent correspondence to Equifax, requesting that Equifax verify and correct the inaccurate, erroneous and unverified representations made by Cenlar on his credit file.

52. Plaintiff received a dispute results report from Equifax dated July 8, 2023.

53. Within the July 8, 2023 report, Equifax continued its reporting of the inaccurate, erroneous and unverified representations made by Cenlar.

54. On or around May 18, 2023 and September 15, 2023, Plaintiff sent correspondence to Trans Union, requesting that Trans Union verify and correct the inaccurate, erroneous and unverified representations made by Cenlar on his credit file.

55. Plaintiff received a dispute results report from Trans Union dated October 26, 2023.

56. Within the October 26, 2023 report, Trans Union continued its reporting of the inaccurate, erroneous and unverified representations made by Cenlar.

57. Subsequent to Plaintiff's disputes, Equifax, Experian and Trans Union failed to remove the inaccurate information regarding the Cenlar account contained within Plaintiff's credit reports.

### *Plaintiff Disputes The Inaccuracies with Cenlar*

58. A check of his consumer files maintained by Equifax, Experian and Trans Union also revealed that Cenlar was furnishing inaccurate, erroneous and unverified information about the mortgage account to Equifax, Experian and Trans Union.

59. The information furnished by Cenlar to Equifax, Experian and Trans Union was at all times inaccurate and erroneous.

60. On or about May 18, 2023 and September 15, 2023, Plaintiff sent correspondence to Equifax, requesting that Equifax verify and correct the inaccurate, erroneous, and unverified representations made by Cenlar on his credit file.

61. On or about a date better known to Equifax and Cenlar, Equifax furnished Plaintiff's disputes to Cenlar.

62. Cenlar failed to reasonably reinvestigate Plaintiff's disputes that Cenlar received from Equifax in violation of the FCRA.

63. On or about May 18, 2023 and September 15, 2023, Plaintiff sent correspondence to Experian, requesting that Experian verify and correct the inaccurate, erroneous, and unverified representations made by Cenlar on his credit file.

64. On or about a date better known to Experian and Cenlar, Experian furnished Plaintiff's disputes to Cenlar.

65. Cenlar failed to reasonably reinvestigate Plaintiff's disputes that Cenlar received from Experian in violation of the FCRA.

66. On or about May 18, 2023 and September 15, 2023, Plaintiff sent correspondence to Trans Union, requesting that Trans Union verify and correct the inaccurate, erroneous, and unverified representations made by Cenlar on his credit file.

67. On or about a date better known to Trans Union and Cenlar, Trans Union furnished Plaintiff's disputes to Cenlar via e-Oscar.

68. Cenlar failed to reasonably reinvestigate Plaintiff's disputes that Cenlar received from Trans Union in violation of the FCRA.

69. At the date of this filing, Cenlar has failed to reasonably reinvestigate into Plaintiff's dispute and has failed to accurately correct and update or delete Plaintiff's information.

### The CRA Defendants Did Not And Do Not
### Conduct Any Investigation Of Most Consumer Disputes

70. Unknown to the Plaintiff until this lawsuit, it has long been the practice of both Trans Union and Equifax to refuse to perform that statutorily mandated FCRA investigation and instead delegate all action in response to consumer disputes to a third-party outsource vendor located overseas.  Both these Defendants use the same vendor, previously known as Intelenet Global Services and now as Teleperformace.

71. It has long been the practice of Experian to refuse to perform that statutorily mandated FCRA investigation and instead delegate all action in response to consumer disputes to an affiliated company, Experian Services Chile, S.S. in Santiago, Chile.[2]

72. The CRAs' dispute processing vendor is not hired to perform an actual FCRA investigation. Instead, its sole responsibility is to read consumer dispute letters, select one of a handful of common dispute codes from a drop-down menu and then click that code.

73. In fact, the CRA Defendants strongly encourage consumers to make disputes through their online websites. When consumers do so, the consumer has to click one of just a few available dispute reasons (such as "Not my account."). The online dispute then is outputted into the "e-Oscar" system described below without ever touching human hands or being read by human eyes at Equifax or Trans Union. It gets sent to Defendants' creditor customer for its sole review and consideration.

74. Here is how it the written mail dispute process actually works: for Equifax, a third-party document processing company in Atlanta maintains several Post Office boxes for receiving consumer mail to Equifax such as disputes, requests for a credit file disclosure or other communication. That mailbox company receives consumer disputes, scans them into a batch of other disputes.

---

[2] Experian long ago lost the argument that testimony from these dispute agents requires more than a garden-variety Rule 30 notice. *Calderon v. Experian Info. Sols., Inc.*, 290 F.R.D. 508, 510 (D. Idaho 2013). In recent litigation by Plaintiff's Counsel in the Eastern District of Virginia, *Sublett v. Nissan of Richmond, et al.*, No. 3:20-cv-00156 (E.D. Va.), however, Experian presented the supposed third-party Chilean dispute investigator pursuant to Plaintiff's notice of deposition under Rule 30. To the extent Experian would argue here that it cannot produce the Chilean dispute agents pursuant to a Rule 30 notice, then Plaintiff will pursue his 1681i failure-to-investigate claim on the theory that no investigation was conducted by the CRA.

75. Trans Union, on the other hand, receives and scans the mail into batches directly out of its facility in Eastern Pennsylvania. Experian's dispute processing simply takes the disputes out of its hands and places them into what Experian has argued is an unrelated third party.

76. Both Equifax and Trans Union then forward the dispute mail batches to the same third-party, Teleperformance, based in Mumbai, India. Teleperformance uses low-wage employees to work quickly to process the consumer dispute letters received from the Atlanta-based mail company, skimming the letters and selecting one of a handful of codes from a dropdown menu to best describe the consumer's detailed dispute information in 2 digits. For example, the most common relevant code is: "01 Not his/her."

77. Teleperformance agents are not allowed to do any of these things: contact the consumer; use the telephone or e-mail to investigate; research; contact the furnisher directly; or take longer than 5 minutes per dispute.

78. Equifax and Trans Union have both taken the position in other litigation that they have no control over the Teleperformance. For example, under oath before another court just this year, Equifax's representative employee testified: "Intelenet has no corporate affiliation with Equifax. Intelenet is not a corporate partner of Equifax. Rather, Intelenet is a company wholly separate from Equifax and is a party to a contract with Equifax wherein Equifax hired Intelenet to assist Equifax with various matters. Neither Mr. Negi nor Mr. Singh [the dispute processing agents] are employees of Equifax." *Miller v. Equifax Info. Serv.*, Case No. 4:19-cv-584, ECF 47-1 (M.D. Fl. Sept. 18,

2020). And in its briefing in that same case, Equifax argued, "Courts have determined that Intelenet is a separate legal entity, not controlled by a party."

79. Trans Union has taken and succeeded with this same position. *See, e,g.*, *Wilcox v. Servis One, Inc.*, No. 1:19-cv-02545-RDB (D. Md.), ECF 71 (ruling that TransUnion did not have control or the ability to produce for deposition Indian employees of Intelenet).

80. Regardless of whether or not these statements are correct, both Equifax and Trans Union believe that they cannot direct, control, manage or reliably influence the employees of their third-party Indian outsource vendor.

81. Equifax and Trans Union themselves did not conduct any reinvestigation of Plaintiff's many disputes. Instead, they merely caused them to be removed from their control to be saved within a database by an overseas data-processing vendor.

### *Plaintiff Suffered Actual Harm*

82. The CRA Defendants have continued to report the erroneous accounts on the Plaintiff's credit report, despite being notified that Plaintiff was a victim of identity theft.

83. Defendant Cenlar has continued to furnish erroneous information to the CRAs, despite being notified that the information is inaccurate.

84. Plaintiff has been attempting to resolve these matters with the CRA Defendants for over a year and his credit was significantly destroyed by Defendants' failure to correct the inaccurate reporting.

85. Plaintiff has been attempting to resolve these matters with Defendant Cenlar for over two years to no avail and his livelihood has been significantly and continuously threatened by Cenlar's actions.

86. As a result of the inaccurate credit reporting, Plaintiff has suffered damages, including, but not limited to:

    a.  Stress associated with multiple denials for personal loans, credit cards, and delays in applying for future lines of credit;

    b.  Monies lost by attempting to fix his credit, e.g. communication costs, postage for disputes;

    c.  Loss of time attempting to cure the errors;

    d.  Mental anguish, stress, aggravation, and other related impairments to the enjoyment of life.

87. Stress associated with hundreds of hours attempting to resolve this matter in the last year.

88. As a result of the inaccurate furnishing and collection activity by Cenlar, Plaintiff has suffered damages, including, but not limited to:

    a.  Stress associated with multiple denials for personal loans, credit cards, and delays in applying for future lines of credit;

    b.  Monies lost by attempting to fix his credit, e.g. communication costs, postage for disputes;

    c.  Loss of time attempting to cure the errors;

    d.  Mental anguish, stress, aggravation, and other related impairments to the enjoyment of life.

89. Stress associated with hundreds of hours attempting to resolve this matter in the last two years.

### *Defendants' Conduct Was Willful*

90. The FCRA allows for a remedy for a "willful" violation.  A willful act or violation includes, "not only knowing violations of [the statute], but reckless ones as well." *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, at 57 (2007).  A "reckless" action includes conduct whereby "the company ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless." *Id.* at 69.

91. Proof of willfulness includes, for example, "evidence that other consumers have lodged complaints similar to" the one made by the Plaintiff and a failure to make the correction right away. *Dalton*, 257 F.3d at 418;  *Saunders v. Branch Banking & Trust Co. of Va.*, 526 F.3d 142, 151 (4th Cir. 2008).

92. As detailed above, the FCRA section at issue here, and informative guidance, have been around now for over 50 years.  The language of § 1681e(b) has not changed.  The CRA Defendants' dispute investigation obligations under § 1681i(a) have not changed.  The FCRA's caution of Defendants' "grave responsibilities" to ensure accuracy has not changed.

93. The CRA Defendants have received many thousands of disputes and other complaints regarding the creditors at issue in this case – sufficient to require a reasonable company to at least examine or investigate further before blindly accepting further reporting.

94. Just in federal court alone, during the last decade the creditor-furnishers disputed by Plaintiff has had to defend collectively over 1,000 consumer lawsuits.

95. In many or even most of these FCRA lawsuits brought by a consumer, one or more of the CRA Defendants was a named co-defendant.

96. The CRA Defendants knew or should have known of this litigation history. They use and have access to PACER to investigate and monitor such consumer complaints.

97. The CFPB has maintained a Consumer Complaint database since 2017. It receives a small percentage of the total consumer credit reporting complaints made nationwide, as many multiples more are made directly to the Defendants, and/or to other government agencies, attorneys, or non-profit organizations.

98. Each Defendant regularly receives unredacted consumer dispute details from this database.

99. Since the database began accepting complaints in 2017, the CFPB has sent hundreds of thousands of consumer credit reporting complaints to Equifax.

100.    Since the database began accepting complaints in 2017, the CFPB has sent hundreds of thousands of consumer credit reporting complaints to Experian.

101.    Since the database began accepting complaints in 2017, the CFPB has sent hundreds of thousands of consumer credit reporting complaints to Trans Union.

102.    Further, over 35,000 of the CFPB complaints against Equifax, more than 33,000 complaints as to Experian, and just shy of 38,000 against TransUnion were based largely on their failure to reasonably investigate consumer disputes.

103.    Just in the last 12 months alone, Experian, Equifax, and TransUnion have each been sued on by consumers alleging their violation of the FCRA over 2,000 times. Most of these alleged that the Defendant violated § 1681i(a) by failing to conduct a lawful reinvestigation of the consumer's accuracy dispute. This complaint history has been true for nearly every year over the last decade.

104.    While the thousands of consumer complaints and hundreds of thousands of consumer disputes alone would have put Defendants on notice of the failures of their dispute investigation procedures in ensuring accuracy, numerous Federal District and Circuit Courts have placed the CRA Defendants on notice that they may not merely "parrot" what their creditor-customer tells them if the consumer had provided a substantive and detailed dispute.

105.    Experian and Equifax have had actual notice from numerous other courts that their blind ACDV "parroting" was unlawful. *See, e.g.*, *Centuori v. Experian Info. Sols., Inc.*, 431 F. Supp. 2d 1002, 1008 (D. Ariz. 2006) ("'The grave responsibility imposed by [the FCRA] must consist of something more than merely parroting information received from other sources.'"); *Schweitzer v. Equifax Info. Sols. LLC*, 441 F. App'x 896, 904 (3d Cir. 2011); *Pourfard v. Equifax Info. Sols. LLC*, 2010 WL 55446 (D. Or. Jan. 7, 2010) ("[T]he caselaw is clear that a reporting agency does not act reasonably under the FCRA by deferring entirely to another source of information."); *Bradshaw v. BAC Home Loans Servicing, LP*, 816 F. Supp. 2d 1066, 1073-74 (D. Or. 2011) ("[Equifax] instead utilized an automated dispute system to verify the accuracy of plaintiffs' account. Many courts, including this one, have concluded that where a CRA is affirmatively on notice that information received from a creditor may be suspect, it is unreasonable as a matter of law for the agency to simply verify the creditor's information through the ACDV process without additional investigation.").

106.    Equifax has even been warned by its home District Court, the Northern District of Georgia, which detailed:

Equifax argues that the creditor is the party responsible for investigating the dispute, once notified of it by the reporting agency. 15 U.S.C.A. § 1681s-2(b)

(1998). According to Equifax, the reporting agency's duty under § 1681i is fulfilled once it forwards the complaint to the creditor, the entity in the best position to undertake an accurate investigation. Under § 1681s-2(b), furnishers of information, such as creditors, have certain duties to investigate consumers' disputes. Yet, this does not end the inquiry, or establish that the reporting agency has no responsibility beyond serving as a conduit for consumers' complaints.

To the contrary, a credit reporting agency does not conduct a reasonable investigation by deferring entirely to another source of information. "In a reinvestigation of the accuracy of credit reports, a credit bureau must bear some responsibility for evaluating the accuracy of information obtained from subscribers." *Stevenson,* 987 F.2d at 293. The FCRA "places the burden of investigation squarely on" the reporting agency. *Id.; see also Henson v. CSC Credit Servs.,* 29 F.3d 280, 286-87 (7th Cir. 1994); *Swoager v. Credit Bureau,* 608 F.Supp. 972, 976 (M.D. Fla.1985).

*Sampson v. Equifax Info. Servs., LLC*, No. CIV.A. CV204-187, 2005 WL 2095092, at *5

(S.D. Ga. Aug. 29, 2005).

107.    Trans Union has long been on even clearer notice.  The seminal Circuit Court

decision addressing § 1681i(a) and finding that a CRA does not conduct a reasonable

reinvestigation of a consumer's substantive dispute if it merely "parrots" its creditor-

customer was a TransUnion case. *Cushman v. Trans Union Corp.*, 115 F.3d 220, 225

(3d Cir. 1997).   TransUnion's notice was so substantial that one District Court

instructed the jury in a § 1681i(a) trial:

In assessing the issue of notice to Trans Union, you are instructed that, on several occasions since 1997, decisions of federal courts have informed . . . that the Fair Credit Reporting Act's Requirement for a reasonable reinvestigation must consist of something more than simply the parroting of information received from other sources and/or that a credit reporting agency does not act reasonably by deferring entirely to another source of information, such as a creditor.

*Mullins v. Equifax Info. Servs., LLC*, CIV. 3:05CV888 (E.D. Va. Aug. 27, 2007)

108.    Defendants have also been repeatedly criticized by Federal and state regulators, and

consumer groups for the refusal or failure to conduct substantive reinvestigations.

109.     In 2015, a large group of state Attorneys General forced a consent order from the
CRA Defendants by which they were required to develop procedures necessary to
comply with the FCRA.[3]  The AG Settlement required amongst many changes and
mandates that the Defendant comply with § 1681i(a).

110.     The AG Settlement also required the CRA Defendants to conduct significant
research and data gathering – even creating a "working group" to address these issues,
and to develop special procedures to handle disputes as in this case.  Notwithstanding
these requirements, the Defendants did not meaningfully comply with the AG
Settlement in these regards.

111.     Defendants are also aware of substantive and detailed criticism by public interest
groups about their automated dispute system.  For example, in 2009, the National
Consumer Law Center ("NCLC"), the organization that publishes the leading egal
treatise in this field, also published a scathing research paper detailing the actual
process followed by Defendants when a consumer makes a dispute.  That report was
updated in 2019.  AUTOMATED INJUSTICE REDUX *Ten Years after a Key Report,
Consumers Are Still Frustrated Trying to Fix Credit Reporting Errors*, National
Consumer Law Center, February 2019. ("NCLC Report").[4]

112.     The NCLC Report summarized its context:

Ten years ago, the National Consumer Law Center (NCLC) issued Automated
Injustice: How a Mechanized Dispute System Frustrates Consumers Seeking to Fix
Errors in their Credit Reports, the landmark report on the serious dysfunctions in
the American credit reporting system. Since then, the Consumer Financial
Protection Bureau (CFPB) began exercising supervision authority over the Big
Three credit bureaus (Equifax, Experian and TransUnion), and started the difficult

---

[3]       Available       at       https://www.ohioattorneygeneral.gov/Files/Briefing-Room/News-
Releases/Consumer-Protection/2015-05-20-CRAs-AVC.aspx.
[4] Available at https://www.nclc.org/images/pdf/credit_reports/automated-injustice-redux.pdf.

task of compelling them to reform their procedures and practices. A coalition of more than 30 state Attorneys General reached a breakthrough settlement with the credit bureaus in 2015, requiring an array of reforms. Despite these very laudable achievements, the credit bureaus and the companies that supply them with information still have serious problems in ensuring the accuracy of credit reports, affecting millions of American consumers. The dispute process required by the Fair Credit Reporting Act (FCRA) that was intended to fix these problems remains ineffective and biased.

113.     Among many of the Defendants' accuracy failures, the NCLC Report discovered:

- **Insufficient Information Conveyed and Considered in Investigation**.  Credit bureaus use the highly automated e-OSCAR system to convey disputes to furnishers, primarily using shorthand two- or three-digit codes, and at most only a line or two of text in a minority of instances. The credit bureaus use the same four or five codes over 80% of the time.

- **Failure to Transmit Information Submitted by the Consumer**. Credit bureaus failed to send supporting documentation submitted by consumers to furnishers, in clear violation of the FCRA.

- **Perfunctory Credit Bureau Investigations**. Credit bureaus limit the role of their employees who handle disputes, or of the foreign workers employed by their offshore vendors, to little more than selecting these two or three digit codes. Workers do not examine documents, contact consumers by phone or email, or exercise any form of human discretion in resolving a dispute.

- **Credit Bureaus Always Side with Furnishers**. Credit bureaus are universally biased in favor of furnishers and against consumers in disputes. In a practice known as "parroting," credit bureaus blindly adopted the response of the furnisher without performing any independent review.

NCLC Report at 6.

114.     Despite the notice and judicial, regulatory and public interest criticism, Defendants

have refused to change their dispute investigation process because it would cost too

much money to do so.

115.    Defendants' procedures imposed on the Plaintiff and similarly situated consumers an unjustifiably and unreasonable risk of harm that could have been mitigated or avoided with just modest imposition.

## CLAIMS FOR RELIEF

### COUNT 1: AGAINST EXPERIAN, EQUIFAX, AND TRANSUNION
### Violation of § 1681e(b) of the FCRA

116.    The Plaintiff realleges and incorporates the foregoing paragraphs as if fully set out herein.

117.    Defendants Experian, Equifax, and Trans Union willfully violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the consumer report and consumer files they published and maintained concerning the Plaintiff.

118.    As a result of this conduct, action and inaction of Experian, Equifax and Trans Union, the Plaintiff suffered damage by loss of credit, loss of the ability to purchase and benefit from a credit, reduction in credit scores, reduction in lines of credit, and denial for various financial products, the mental and emotional pain and anguish and the humiliation and embarrassment of having to borrow money and offer explanations for why he lost the ability to benefit from credit.

119.    Further, after the Plaintiff's detailed disputes put them on notice of likely inaccuracies and reasons to doubt the correctness of the reporting of their creditor-customers, both Equifax and Trans Union ignored such information and did not use any human or substantive review to confirm and verify that its procedures were ensuring maximum possible accuracy of the Plaintiff's credit reports.

120.    Each defendant furnished multiple consumer reports to third parties containing the inaccurate tradeline information and each Defendant did so after receiving notice of these inaccuracies.

121.    Experian, Equifax and Trans Union's conduct, action and inaction was willful, rendering them liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

122.    As a result of Experian, Equifax, and Trans Union's violations of 15 U.S.C. § 1681e(b), the Plaintiff is entitled to recover his actual damages pursuant to 15 U.S.C. § 1681n and/or § 1681o, or in the alternative his statutory damages of $1,000 pursuant to 15 U.S.C. § 1681n.

123.    The Plaintiff is entitled to recover costs and attorney's fees from Experian, Equifax and Trans Union in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

**COUNT 2: AGAINST EXPERIAN, EQUIFAX, AND TRANSUNION**
**Violation of § 1681i of the FCRA**

124.    The Plaintiff Plaintiff's credit file; and by relying upon verification from a source it has reason to know is unreliable.

125.    Further, both Equifax and Trans Union violated Section 1681i by conducting ***no investigation at all***. Section 1681i demands that when Plaintiff notified each CRA directly of his disputes, that party—the consumer reporting agency who received the disputes—must investigate those disputes. The statute does not contemplate someone other than Equifax or Trans Union conducting the investigation.

126.    Yet, both Equifax and Trans Union used an unrelated third-party, Intelenet, over which neither CRA has control to conduct its investigations. Intelenet is not, in the

words of the statute, "the [consumer reporting] agency" to whom Plaintiff disputed. Equifax and Trans Union therefore violated 1681i on this basis because they sent Plaintiff's disputes away to a company that was not their controlled agent rather than investigating them as required.As a result of Defendants' violations of 15 U.S.C. § 1681i, the Plaintiff is entitled to recover his actual damages pursuant to 15 U.S.C. § 1681n and/or § 1681o, or in the alternative his statutory damages of $1,000 pursuant to 15 U.S.C. § 1681n.

127.    Defendants' conduct, action, and inaction was willful, rendering each Defendant liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

128.    The Plaintiff is entitled to recover costs and attorneys' fees from Experian, Equifax, and Trans Union in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## COUNT 3: AGAINST CENLAR
## Violation of § 1681s-2(b)(1)(A) of the FCRA

129.    Plaintiff repeats and realleges the allegations contained in the above paragraphs and incorporates them with the same force and effect as if set forth specifically herein.

130.    The FCRA requires that "After receiving notice of a dispute with regard to the completeness or accuracy of any information provided by a person to a consumer reporting agency, the person shall conduct an investigation with respect to the disputed information." 15 U.S.C. § 1681s-2(b)(1)(A).

131.    It is evident that Defendant Cenlar failed to fully conduct a reasonable investigation of the Plaintiff's dispute after said dispute was furnished to Cenlar by

Equifax, Experian and Trans Union, as required by 15 U.S.C. § 1681s-2(b)(1)(A).

132.    As a result of the above-described violation to §1681s-2(b)(1)(A), Plaintiff has

sustained damages including denial of credit, emotional distress, and mental, financial

and physical pain.

133.    Defendant Cenlar's conduct was a direct and proximate cause, as well as a

substantial factor, in causing serious injuries, damages and harm to Plaintiff that are

outlined more completely above.

134.    Defendant Cenlar's violative conduct was intentional, willful and negligent.

135.    The violations by Cenlar were willful, rendering it liable for punitive damages in

an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the

alternative, Cenlar was negligent, entitling the Plaintiff to recovery under 15 U.S.C.

§ 1681o.

136.    Plaintiff is entitled to recover actual damages, statutory damages, punitive

damages, costs and attorney's fees from Cenlar in an amount to be determined by the

Court pursuant to 15 U.S.C. § 1681n and § 1681o.

### COUNT 4: AGAINST CENLAR
### Violation of § 1681s-2(b)(1)(E) of the FCRA

137.    Plaintiff repeats and realleges the allegations contained in the above paragraphs

and incorporates them with the same force and effect as if set forth specifically herein.

138.    Defendant Cenlar violated FCRA § 1681s-2(b)(1)(E).

139.    The § 1681s-2(b)(1)(E) of the FCRA provides that if an item of information

disputed by a consumer is found to be inaccurate or incomplete or cannot be verified

after any reinvestigation, for purposes of reporting to a consumer reporting agency

only, as appropriate, based on the results of the reinvestigation promptly modify that item of information; delete that item of information; or permanently block the reporting of that item of information.

140. Defendant Cenlar failed to accurately correct and update or delete Plaintiff's information for a period of time subsequent to receiving Plaintiff's dispute from Equifax, Experian and Trans Union prior to the commencement of this action any as required by 15 U.S.C. § 1681s-2(b)(1)(E).

141. As a result of the above-described violation to §1681s-2(b)(1)(E), Plaintiff has sustained damages including denial of credit, emotional distress, and mental, financial and physical pain.

142. Defendant Cenlar's conduct was a direct and proximate cause, as well as a substantial factor, in causing serious injuries, damages and harm to Plaintiff that are outlined more completely above.

143. Defendant Cenlar's violative conduct was intentional, willful and negligent.

144. The violations by Cenlar were willful, rendering it liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, Cenlar was negligent, entitling the Plaintiff to recovery under 15 U.S.C. § 1681o.

145. Plaintiff is entitled to recover actual damages, statutory damages, punitive damages, costs and attorney's fees from Cenlar in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

## JURY DEMAND

146. Pursuant to Federal Rule of Civil Procedure 38, Plaintiff hereby demands a trial

by jury of all issues triable by jury.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Ambrose Ekundayo, respectfully requests judgment be entered against Defendants for the following:

A. Declaratory judgment that Defendants violated the FCRA;

B. Actual damages pursuant to 15 U.S.C. §1681n(a);

C. Statutory damages pursuant to 15 U.S.C. §1681n(a)(1)(A);

D. Punitive damages pursuant to 15 U.S.C. §1681n(a)(2);

E. Costs and reasonable attorney's fees pursuant to 15 U.S.C. §§1681n(c) and 1681o(b);

F. Awarding Plaintiff any pre-judgment and post-judgment interest as may be allowed under the law;

G. Specific performance and injunctive relief; and

H. Any relief that this Court deems appropriate.

Dated: February 27, 2024
New York, New York

**LAW OFFICE OF ABEL L. PIERRE,**
**ATTORNEY-AT-LAW, P.C.**

Attorney I.D.#AP-5508
140 Broadway, 46th Floor
New York, New York 10005
Telephone: (212) 766-3323
Facsimile: (212) 766-3322
abel@apierrelaw.com

*Attorneys for Plaintiff*